# Richmond

MARY EPPES V. MARY VAN DEUSEN EPPES, EXECUTRIX, &C.

January 13, 1938.

Present, All the Justices.

The opinion states the case.

*Bernard C. Syme* and *J. Gordon Bohannan,* for the appellant.

*E. D. Lucas,* for the appellee.

CAMPBELL, C. J., delivered the opinion of the court.

This suit was instituted by Mary Van Deusen Eppes, in her own right and as executrix of the estate of Richard Eppes, deceased, against Mary Eppes and Samuel W. Zimmer, executor of the estate of Richard Eppes, deceased. The object of the suit was to enforce a compliance upon the part of the respondent, Mary Eppes, with certain contracts entered into by and between Mary Eppes and Josephine D. Eppes, parties of the first part, and Richard Eppes, party of the second part.

The bill alleges that Mary Eppes, upon the death of Josephine D. Eppes, as devisee under her will, succeeded to all the rights and interests of Josephine D. Eppes, deceased. The bill further alleges that Samuel W. Zimmer, executor of the estate of Richard Eppes, deceased, was made a party defendant to the bill, for the reason that he refused to be made a party complainant.

The contracts upon which the complainant relies, and which are filed as exhibits to the bill read as follows:

"This contract and agreement, made and entered into in duplicate, this 21st day of February, in the year 1916, by and between Josephine D. Eppes and Mary Eppes, both unmarried, parties of the first part, and Richard Eppes, party of the second part:

"WHEREAS, the parties of the first part have sub-divided and sold certain lands formerly owned by them, and situated in the County of Prince George, Virginia, which said land is shown on a plat known as 'West City Point,' which plat comprises what is generally known as 'West City Point Subdivision,' and 'West City Point Addition,' and

"WHEREAS, it is the intention of the parties of the first part to subdivide and sell other land now owned by them and which is situated in the County of Prince George, Virginia, and near or in the vicinity of Hopewell and City Point, and

"WHEREAS, the said party of the second part has supervised and managed all of the sales and business of the parties of the first part, and has agreed to continue to do so for any future sales or business of the parties of the first part; and

"WHEREAS, it has been agreed between the parties hereto that the said parties of the first part would pay to the party of the second part, for his services in connection with all their business affairs, one-third of all the net profits arising from the sales of such real estate and of the rents derived from the same and it is deemed advisable that the said agreement between the parties should be reduced to writing.

"Now, THEREFORE, THIS CONTRACT AND AGREEMENT WITNESSETH: That the said parties of the first part, for and in consideration of the sum of $5.00, cash in hand paid to them, the receipt whereof is hereby acknowledged, and of the services rendered and to be rendered them by the party of the second part, do hereby covenant and agree to pay unto the said Richard Eppes, one-third of all the net proceeds from the sales of the following described property, and of any other property that the parties of the first part may desire to sell in or near the vicinity of Hopewell and City Point and one-third of all rents collected from the hereinafter described property:

"(1) On all of that tract of land, known as 'West City Point Subdivision,' which is shown on a plat made by J. M. Wolford, dated April 1, 1915, and of record in the Clerk's Office of the Circuit Court of Prince George County, in Plat book 3, at page 10.

"(2) On all that tract of land, known as 'West City Point Addition,' which is shown on a plat of 'West City Point,' made by W. W. LaPrade & Brothers dated June 9,

1915, and of record in the aforesaid Clerk's Office in Plat book 3, at page ———.

"(3) On all that tract of land known as 'West Hopewell,' as shown on a plat made by W. W. LaPrade & Brothers, dated the ——— day of ——————, 1916, and of record in the aforesaid Clerk's Office, in Plat book 3, at page ———.

"(4) And also on any other land, which the parties of the first part may hereafter determine to subdivide and sell, which is owned by them, and which lies west of the streets known as Bonnacord and Bermuda Street, as shown on aforesaid plat of 'West City Point' and also on any other land owned by them and situated on the south side of the Norfolk & Western Railroad and west of the present boundary line of the property of the E. I. DuPont De Nemours & Company.

"(5) Also all of the rents arising from the land which is now or may hereafter be leased, and which is situated West of the aforesaid Bonnacord Street and also of the profits arising from the sale or grant of any privileges reserved in any of the streets as shown on the aforesaid subdivisions and on any future subdivisions.

"And the said Richard Eppes, in consideration of the payment to him of one-third of the net *profits* arising from the sales and rent as aforesaid, covenants and agrees to supervise, manage and conduct all business of the parties of the first part in connection with and incident to the sales of any of the property herein set forth, and to account to the parties of the first part for all his transactions at any time that they may so desire, and in general to do everything needful and necessary for the proper conduct and promotion of their business and to devote his time to carrying out sales of said property and to the management of their business.

"This agreement may be terminated by either party hereto, by giving six months notice to the other party of the intention to terminate this contract at the end of the said period.

"Witness the following signatures and seals:

"(Signed) JOSEPHINE D. EPPES (Seal)
"(Signed) MARY EPPES (Seal)
"(Signed) RICHARD EPPES (Seal)"

"THIS CONTRACT AND AGREEMENT, made and entered into in duplicate, this 29th day of July, 1918, by and between Josephine D. Eppes and Mary Eppes, both unmarried, parties of the first part, and Richard Eppes, party of the second part;

"WHEREAS, the parties of the first part have sub-divided and sold certain lands formerly owned by them, situate in the County of Prince George, Virginia, which said land is shown on a plat known as 'West City Point' which plat comprises what is generally known as 'West City Point Subdivision' and 'West City Point Addition'; and

"WHEREAS, it is the intention of the parties of the first part to sub-divide and sell other land now owned by them and which is situate in the County of Prince George, Virginia, and near or in the vicinity of Hopewell and City Point; and

"WHEREAS, the said party of the second part has supervised and managed all of the sales and business of the parties of the first part, and has agreed to continue to do so for any future sales or business of the parties of the first part; and

"WHEREAS, it has been agreed between the parties hereto that the said parties of the first part will pay to the party of the second part, for his services in connection with all of. their business affairs, one-third of all of the gross receipts, less all working expenses, arising from the sale of such real estate and of the rent derived from the same, and it is deemed advisable that the said agreement between the parties should be reduced to writing;

"Now, THEREFORE, THIS AGREEMENT WITNESSETH: That the said parties of the first part, for and in consideration of the premises and of the sum of Five Dollars, ($5.00) cash

in hand paid to them, the receipt whereof is hereby acknowledged, and of the services to be rendered by the party of the second part, do hereby covenant and agree to pay unto the said Richard Eppes one-third of all the gross receipts, less all working expenses, of the sales of the following described property, and of any other property that the parties of the first part may desire to sell in or near the vicinity of Hopewell and City Point, and one-third of all the rents collected from the hereinafter described property;

"(1) On all of that tract of land, known as 'West City Point Sub-division,' which is shown on a plat made by J. M. Wolford, dated April 1st, 1915, and of record in the Clerk's Office of the Circuit Court of Prince George County, in plat book 3, at page 10,

"(2) On all that tract of land, known as 'West City Point Addition,' which is shown on a plat of West City Point made by W. W. LaPrade & Brothers, dated June 9th, 1915, and of record in the aforesaid Clerk's Office in plat book 3, at page ——.

"(3) On all that tract of land known as 'West Hopewell,' as shown on a plat made by W. W. LaPrade & Brothers, dated the —— day of ————, 1916, and of record in the aforesaid Clerk's Office in plat book 3, at page ——.

"(4) And also on any other land which the parties of the first part may hereafter determine to rent out, subdivide or sell, which is owned by them, and which lies West of the Streets known as Bonnacord Street and Bermuda Street, to the Appomattox River, as shown on the aforesaid plat of 'West City Point' and also on any other land owned by them and situate on the South side of the Norfolk and Western Railroad and West of the present boundary line of the property of E. I. DuPont DeNemours & Company.

"(5) Also all of the rents arising from the land which is now or may hereafter be leased and which is situate West of the aforesaid Bonnacord Street and also of the profits arising from the sale or grant of any rights or privileges reserved in any of the streets as shown on the aforesaid subdivisions and any future subdivisions.

"And the said parties of the first part further covenant and agree that at the termination of this agreement they will immediately convey to the said Richard Eppes, if living, and should he be dead, to his heirs or such persons as he shall by will designate, an undivided one-third interest in and to such of the property above mentioned as may at the date of such termination remain unsold.

"And the said Richard Eppes, in consideration of the payment to him of one-third of the gross receipts, less working expenses arising from the sales and rent as aforesaid, and of the other covenants and agreements to be kept and performed by the parties of the first part, covenants and agrees to supervise, manage and conduct all business of the parties of the first part in connection with and incident to the sales of any of the property herein set forth, and to account to the parties of the first part for all of his transactions at any time that they may so desire, and in general to do everything needful and necessary for the proper conduct and promotion of their business and to devote his time to carrying out of sales of the said property and to the management of their business.

"This agreement may be terminated by either party hereto by giving six months notice to the other party of the intention to terminate this contract at the end of said period.

"Witness the following signatures and seals.

| | | |
|---|---|---|
| "(Signed) | JOSEPHINE D. EPPES | (Seal) |
| "(Signed) | MARY EPPES | (Seal) |
| "(Signed) | RICHARD EPPES | (Seal)" |

The prayer of the bill is as follows:

"That Mary Eppes be required to render an accounting of all transactions by and between the said Richard Eppes on the one part, and the said Josephine D. Eppes, and the said Mary Eppes on the other part, under the oral agreement, then under the written agreement marked 'Exhibit A,' and then under the written agreement and contract dated July 29th, 1918, filed herewith, marked 'Exhibit B,' and

"That the said Mary Eppes be required to show the amount and value of all estates, real, personal and mixed, in which the said Richard Eppes, deceased, owned and had an interest at the time of his death, and to make proper settlement and conveyance thereof to these complainants, or to either of them or both of them, and

"That the said Mary Eppes be required to make an accounting of all sales, rents, and leases, and building operations, and of contractors' and other equipment owned and connected with the said properties or bought by Richard Eppes, either as Agent, Manager or personally, or for or in partnership with his said sisters, whether now held by the said Mary Eppes or heretofore disposed of by any one, and,

"That the said Mary Eppes, defendant, be required to produce in court or commission all records, papers, files, writings, contracts, deeds, leases, rental contracts, letters, books and accounts, formerly in possession of Richard Eppes, appertaining to all the above transactions and affairs of the said sisters and partnership, and also all similar writings and records bearing on the said properties executed since his death. That the said Mary Eppes, defendant be ordered and required to pay to these complainants, or either of them, one-third of all cash received from above properties by her since the death of the said Richard Eppes, amounting at least to the sum of $170,000.00, and that she be required specifically to pay to these complainants or to either or both of them the amount so disclosed to be due to Richard Eppes.

"And that the said Mary Eppes be required specifically to pay to these complainants in cash, the further sum of Ten Thousand three hundred dollars ($10,300.00), being one-third the amount paid through Richard Eppes by E. I. DuPont by the check hereinabove referred to for real estate as mentioned,—

"And that the said Mary Eppes be required specifically to deliver a full one-third of all notes remaining unpaid taken and received by Richard Eppes or by her, the said Mary Eppes, in payment of a part of the purchase price of any

part or portion of the aforesaid mentioned property, amounting at least to the sum of $80,000.00,—

"And that the said Mary Eppes be required specifically to execute and deliver a general warranty deed, in fee simple, conveying to these complainants, or to either or both of them, a full one-third undivided interest in and to any and all of the above described mentioned properties remaining unsold at the date of the filing of this suit, as required by the terms of the said contract marked 'Exhibit B' bearing date on the 29th day of July, 1918, and which said contract was terminated May 27, 1922, upon the death of the said Richard Eppes,—

"And that all other accounts and orders which are proper may be taken and made in this cause; that your complainants may have all other, further and general relief in the premises as the nature of their case may require or to equity shall seem meet."

To the bill of complaint the respondent filed her answer and cross-bill.

In the answer it is alleged that respondent has discharged all of her obligations under the contracts to the estate of her brother, Richard Eppes, deceased. In the cross-bill it is alleged that the estate of Richard Eppes, upon a proper accounting, is indebted to her in a large sum of money.

In support of her contention that she is not indebted to the estate of Richard Eppes, respondent relies upon a deed executed by the complainant, on the 31st day of December, 1924. This deed, which will be referred to later, purports to be a settlement of the alleged partnership's transactions.

Complainant, in due course, filed her replication to the answer of respondent and her answer to the cross-bill of respondent.

Upon the pleadings mentioned, the exhibits filed therewith, the depositions of witnesses and the report of the auditor, who was appointed by the chancellor on the motion of the respondent, the cause was matured for a hearing. On October 12, 1936, the chancellor entered a decree adjudicating the principles of the cause pursuant to the chan-

cellor's construction of the contracts involved in this suit. The decree specifically identifies and designates the lands embraced in the contracts in issue, and provides that Richard Eppes' estate is entitled to a one-third interest in all the lands so designated. The decree further provides for the appointment of a commissioner whose duty it shall be to take an account of all the lands in the designated area remaining unsold at the time of the death of Richard Eppes, and, also, take an account of all rents, issues and profits to which the estate of Richard Eppes is entitled. The decree further provides that the commissioner shall ascertain and report any sums due to the respondent from the estate of Richard Eppes.

It is from that decree this appeal was allowed.

From a record consisting originally of the bill of complaint and exhibits filed therewith, the answer and cross-bill of the respondent and the answer to same, the record has grown, since the institution of the suit in July, 1930, to the enormous proportion of two bound volumes consisting of eleven hundred and forty-two pages, together with a brief, filed by counsel for the appellee, containing eight hundred and seventy-six pages.

The petition for an appeal, comprising eighty-eight pages, reflects the earnestness and assiduity of counsel and urges upon this court the consideration of the following sixteen assignments of error:

"(1) The Court erred in admitting in evidence and in considering certain exhibits and certain testimony relating thereto to be found in the record in this suit.

"(2) The Court erred in failing and refusing to take into consideration the original value of the property involved and belonging to Josephine D. and Mary Eppes for the purpose of determining net profits, and in holding that the estate of Richard Eppes was entitled to receive one-third (1/3) of all gross receipts less working expenses arising under the operations of the three contracts.

"(3) The Court erred in holding that the estate of Richard Eppes was entitled to one-third (1/3) of the lands referred

to in the decree of October 12, 1936, with the improvements thereon, and in directing a conveyance of the same, and in holding that the estate was entitled to one-third (1/3) of the sale price of such of said lands sold after the death of Richard Eppes, and in failing to provide for any credit or reimbursement to Mary Eppes for any improvements which she had made on the property since March 27, 1922, or for repairs, taxes, insurance, carrying charges and other expenses incurred in connection therewith.

"(4) The Court erred in directing a conveyance to the estate of Richard Eppes of a one-third (1/3) interest in all such lots, parcels or tracts of land heretofore sold and thereafter repossessed or repurchased by Mary Eppes with the improvements thereon, without providing for any credit or reimbursement to her for expenditures made by her out of her own funds in permanent improvements on such properties or in connection therewith.

"(5) The Court erred in decreeing that Mary Eppes pay one-third (1/3) of the rents, issues and profits derived by her from the real estate remaining unsold at the death of Richard Eppes and referred to in the decree of October 12, 1936, and in failing to take into consideration in connection therewith any enhancement of the rental value of the said property by reason of any improvements placed upon the same by Mary Eppes after the death of Richard Eppes, and in failing to allow any credit or reimbursement to Mary Eppes by reason thereof.

"(6) The Court erred in directing Mary Eppes to pay to the estate of Richard Eppes one-third (1/3) of the proceeds of the sale by her of any franchises, etc., without taking into account any expenses paid by Mary Eppes in connection with the sale or conveyance of the same.

"(7) The Court erred in including certain lands within the provisions of the decree of October 12, 1936, and in holding that the estate of Richard Eppes was entitled to one-third (1/3) thereof, or to one-third (1/3) of the sale price of such as was sold after his death.

"(8) The Court erred in refusing to hold that the deed of December 31, 1924, constituted a full compliance by the defendant with the provisions of the contract of January 29, 1918.

"(9) The Court erred in holding that there was any consideration for the contract of July 29, 1918, insofar as it provided for any additional remuneration to Richard Eppes for his services.

"(10) The Court erred in decreeing that the Pecan Avenue property, in respect to the two-thirds (2/3) undivided interest therein, as of the date of the death of Richard Eppes, be charged with a liability to the estate of Richard Eppes for an amount equivalent to one-third (1/3) of the DuPont check, with interest thereon, and in holding that the estate of Richard Eppes was entitled to any part of the said check and that there was any agreement to convey to Richard Eppes any interest in the Pecan Avenue property in satisfaction of his supposed interest in the said check, and further erred in directing the Commissioner to make a report with respect to these matters and in failing to provide in its decree for any credit to Mary Eppes for taxes, rent or interest or improvements made on the said property.

"(11) The Court erred in requiring Mary Eppes to deliver to the estate of Richard Eppes one-third (1/3) of the personal property shown on the audit at page 34 as belonging to 'Richard Eppes Agency Account' as of March 27, 1922, and in failing to make provision for reimbursing Mary Eppes for storage, care and custody or for taxes and insurance paid in connection with this property.

"(12) The Court erred in directing the Commissioner to make any inquiry and report concerning the item of City Point Expense and in failing to charge the same as an expense of the agency under the evidence in this case.

"(13) The Court erred in failing to credit the agency account and to charge the estate of Richard Eppes with the sum of $150.00 a month which was received by Richard Eppes subsequent to the dates of the two written contracts, and with the amount in excess of $150.00 a month received

by Richard Eppes before the date of the contract of February 21, 1916, and in failing to limit the withdrawals of Richard Eppes to the amounts provided for in the respective contracts.

"(14) The Court erred in not requiring Richard Eppes to account for the profits realized by him on the lots and parcels of land within the designated area purchased by him in his lifetime from Richard Eppes Agent and later sold by him, and in directing the special Commissioner to state an account of all such lots and parcels of land 'in order that his estate may be held to account for such of said lots, if not heretofore accounted for, as may have been sold by him at the prices at which they were first sold by him respectively, stating the fair market value thereof, whether sold or unsold by him, at the time of his purchase thereof.'

"(15) The Court erred in not holding the estate of Richard Eppes liable for the over-draft appearing in the audit and in directing the Commissioner to report with regard to same.

"(16) The Court erred in decreeing that two-thirds (2/3) of the cost of the audit should be paid by Mary Eppes."

After a careful consideration of the record in its entirety, we are of opinion that the conclusion reached by the chancellor, in an able and elaborate opinion, reflects a proper disposition of the cause, deals fully with the debatable assignments of error and points raised in the lower court, and is consonant with the facts and equities displayed by the record. That part of the opinion which we adopt reads as follows:

"A brief history of the subject is not *inapropos*. The questions presented to the Court in this prodigious cause grew out of the sudden and volcanic development of an area lying at the confluence of the Appomattox and James Rivers, in the County of Prince George. Here, on an elevated pleateau the current of life had flowed uneventfully since the first name of Eppes in Virginia had made a settlement

at the historic location known through many generations as City Point.

\* \* \* \* \* \* \*

"Deriving their title through means of no consequence here, four members of the family of Eppes, in the course of time, found themselves possessed of an estate at City Point comprising the lands in which the parties are interested (and on which now, in great part, is located the city of Hopewell). Three maiden sisters possessed joint title to the property, except in respect to one or two particular tracts of a few acres, in which a brother had title jointly with his sisters. Miss Emily Eppes had died before the epoch with which the case had to do, and her interest had been acquired by Miss Josephine D. Eppes and Miss Mary Eppes, who survived her. When the curtain rises upon the first scene of the drama of the real estate development, which is chronicled in the pages of the record, Misses Mary and Josephine Eppes were in occupation of the premises. The brother, Richard, their only near kinsman, was in business in the City of Petersburg, the income from which afforded him but a modest livelihood.

"In the year 1914, the DuPont Company was led to establish a dynamite plant in the vicinity. The erection and operation of this plant inaugurated the boom in real estate in the vortex of which the two sisters became immediately involved. So far as the record goes, neither of the sisters had previously any great experience of business and affairs, when, as it were, this mine was sprung under their very feet, and a treasure, not discovered by them but resulting from causes which no members of the family had reason to anticipate, was poured into their laps * * *. The original worth of the property, which was the subject of exploitation, does not appear in the record. It was such, nevertheless, as might have been ascribed to any similar locality along the shores of the Appomattox River * * *. To say that it had no value would, of course, be untrue, but its

value was, on the other hand, inconsiderable so far as it constituted a taxable resource of the County of Prince George. * * *

 "The first and obvious inquiry is: What are the rights of the parties under the two contracts, and how do the two contracts bear the one upon the other? Contracts in writing are properly construed by the Court. There are no absolute canons for the construction. Technical words, ordinarily, are to be taken in a technical sense. The language of the parties is to be construed in accordance with the ordinary acceptation of the terms used. The language of the instrument under examination is to be considered in connection with the circumstances which gave rise to it. In other words, contracts are to be construed in the light of the surrounding circumstances, which were the inducement to the execution of the contract. The true lodestone is the intention of the parties. It, therefore, follows, as a corollary of these principles that when a written instrument is capable of more than one construction, the Court will give to it that construction which the parties themselves have placed on it. (*Chick* v. *MacBain,* 157 Va. 60, 160 S. E. 214; *Atlantic Coast Realty Co.* v. *Townsend,* 124 Va. 490, 98 S. E. 684.)

"In *Ashland* v. *Newman,* 163 Va. 500, 506, 175 S. E. 724, 176 S. E. 470, Campbell, C. J., thus states the law:

" 'It is held that this Court in construing a contract will look to the circumstances surrounding the transaction, the construction placed upon the contract by the parties thereto, and from that viewpoint seek to arrive at an equitable conclusion.

\* \* \* \* \* \* \*

" 'In the construction of contracts the rule is stated by Judge Burks in *Bank of the Old Dominion* v. *McVeigh,* 32 Gratt. (73 Va.) 530, as follows:

" ' " As said in the opinion in *Talbott* v. *Richmond, etc., R. Co.,* 3 Va. Law Journal, 483, 486, to ascertain the intent

of the parties is the fundamental rule in the construction of agreements (*Canal Company* v. *Hill,* 15 Wall. (82 U. S.) 94, 21 L. Ed. 64) ; and in such construction courts look to the language employed, the subject matter, and the surrounding circumstances. They are never shut out from the same light which the parties enjoyed when the contract was executed, and in that view they are entitled to place themselves in the same situation which the parties who made the contract occupied, so as to view circumstances as they viewed them, and so to judge of the meaning of words and of the correct application of the language to the thing described." '

"In *Holland* v. *Vaughan,* 120 Va. 324, 328, 91 S. E. 122, Chief Justice Prentis says:

" 'No rule for the construction of written instruments is better settled than that which attaches great weight to the construction put upon the instrument by the parties themselves.'

"Cases might be multiplied in support of these propositions. This is unnecessary, for the rule has been universally accepted as laid down by these authorities.

"What were the circumstances under which these contracts were made? What was denominated by the respondent in her testimony in her own behalf as a 'field,' whereon, according to other witnesses, stood a sparse growth of timber, was converted within a few fleeting months into a rich real estate development, producing a handsome fortune to the beneficiaries. The demand for real estate became acute with the establishment of the Du Pont Gun Cotton Plant. What was more natural than that the sisters, Mary and Josephine, should have summoned from Petersburg their brother to represent them, who, otherwise, might have been the victims of an exploitation that would have made them the natural prey of adventurers from the ends of the earth? They had abundant confidence in him, and a faith of record in this case, confirmed by the testimony of the respondent, herself, that the confidence which they bestowed in Richard Eppes, was not misplaced. It is true that the

respondent does tax him with being of a speculative turn, and with jeopardizing to some extent their interests in improvident investments. It is, nevertheless, difficult to see how he could have escaped the danger when the whole plan attending the development of the vicinage was, essentially, a speculation, which suffered its first collapse with the ending of the European War in 1918. He had, too, adventured money in the grading of streets, introduction of the telephone system, of lights, and water, and sewage, and other public utilities incidental to an urban community, but not all his investments complementary to the main enterprise were unfortunate. From some of them the parties in interest were fully remunerated, not only in the increased value of their property itself, but by satisfactory returns upon their investments, provisional though they were, when it became expedient to dispose of such temporary investments upon the more assured organization of the new city and its environs. All that came to these parties was in the nature of the unearned increment of land. It is beside the mark to say that this resulted from the times and the occasion. We are not thus to be blinded to the fact that the agency through which the opportunity afforded by the time and the occasion was appropriated was the industry and application of Richard Eppes, on behalf of his sisters, in making use of his opportunities. The accountant or actuary, in a strict examination of his agency account, the account of 'Richard Eppes, Agent,' has found little which gives rise to any criticism. In transactions aggregating several hundred thousand dollars, the respondent contends that he is indebted to her in the sum of not more than $7,957.11. * * * This was in the nature of an overdraft where all three parties were periodically drawing on the undivided proceeds of the property after deducting all expenses and costs of administration.

"Coming now to consider the contracts in the very terms in which they were expressed, we find that the contract of February 21, 1916, contains by way of preamble several recitals of fact.

"Mary and Josephine are the parties of the first part; Richard the party of the second part. It recites that the parties of the first part have subdivided and sold certain lands, formerly owned by them in Prince George county, on a plat of 'West City Point,' comprising two integral parcels of land or tracts, namely: (a) 'West City Point Subdivision;' (b) 'West City Point Addition;' it recites that it is the intention of the parties of the first part to sell other lands in Prince George county, near, or in the vicinity of Hopewell and City Point; it recites that Richard has supervised and managed all the sales and business of the parties of the first part, and has agreed to continue to do so; it recites that it has been agreed between the parties that Mary and Josephine would pay Richard for his services in connection with all their business affairs 'one-third (1/3) of all the net profits arising from the sales of such real estate and of the rents derived from the same, and that this agreement should be reduced to writing.'

"In other words, the parties have sold certain property prior to this date, they propose to sell more property near, or in the vicinity of Hopewell and City Point, and it has been agreed that the party of the second part, for his services in connection with all the business affairs, is to receive one-third of all the net profits, arising from the sale of such real estate and of the rents derived therefrom. It is apparent that the net profits and the rents in which the party of the second part is to be allowed a portion, are to be referred to the property already sold, as well as to the property left to be sold in view of the fact that his service had been a continuing service, and that the further development devolved upon his shoulders.

" ' * * * This contract * * * WITNESSETH, the parties of the first part * * * in consideration * * * of the services rendered and to be rendered by the party of the second part * * * agree to pay unto the said Richard Eppes one-third (1/3) of all the net profits from the sales of the following described property, and of any other property that the parties of the first part may desire to sell in, or near

the City of Hopewell and City Point, and one-third (1/3) of all the rents collected from the hereinafter described property'; the tracts indicated are:

" '1. "West City Point Sub-division," shown on a plat made by J. M. Wolford, dated April 1, 1915.

" '2. "West City Point Addition," shown on a plat of "West City Point," made by LaPrade & Brothers, dated June 9, 1915.

" '3. Tract shown as "West Hopewell," on a plat by LaPrade & Brothers.

" '4. Any other land, which the parties of the first part may hereafter determine to subdivide and sell, which is owned by them and which lies West of the streets known as Bonnacord Street and Bermuda Street, as shown on aforesaid plat of "West City Point," and also, any other land owned by them and situated on the south side of the Norfolk & Western and West of the present boundary line of the property of E. I. Du Pont DeNemours & Company.

" '5. Also, all of the rents arising from the land which is now or may hereafter be leased, and which is situated west of the aforesaid Bonnacord Street, and also of the profits arising from the sale or grant of any privileges reserved in any of the streets as shown on the aforesaid subdivision and on any future subdivision.'

"Richard Eppes, on his part, agrees to undertake to supervise, manage, and conduct all the business of the parties of the first part in connection with and incident to the sales of any of the property herein set forth, and to account to the parties of the first part for his dealings, as needful and necessary for the proper conduct and promotion of the business of his sisters, and to devote his time to carrying out the sales and management of their business.

"The contract of July 29, 1918, is not, indeed, precisely speaking, a novation of the old contract, although between the same parties in the same relationship. It is a new and enlarged agreement. It recites by way of preamble that the parties of the first part have sub-divided and sold certain lands, formerly owned by them in Prince George

county, shown on a plat of 'West City Point,' comprising 'West City Point Sub-Division' and 'West City Point Addition.'

"It recites that it is the intention of the parties of the first part to subdivide and sell other land now owned by them, situated in Prince George county, near, or in the vicinity of Hopewell and City Point. It recites that the brother has supervised and managed all the sales and business of the parties of the first part, and has agreed to continue to do so.

"It recites that it has been agreed between the parties that the sisters will pay to Richard for his services in connection with all their business affairs one-third of all the gross receipts, less all working expenses, arising from the sale of such real estate and of the rent derived from the same, and that it is deemed advisable to reduce this agreement to writing.

"It stipulates that the parties of the first part in consideration * * * of the services rendered and to be rendered by the brother shall pay to him one-third of all the gross receipts, * * * less all working expenses, of the sales of the following described property, or any other property that the parties of the first part, may desire to sell in or near the 'City of Hopewell' and 'City Point,' and one-third of all the rents collected from the hereinafter described property:

"1. On all of that tract of land, known as 'West City Point Sub-Division,' shown on a plat made by Wolford, dated April 1, 1915.

"2. On all that tract of land, known as 'West City Point Addition,' shown on a plat of 'West City Point,' made by LaPrade & Brothers, dated June 9, 1915.

"3. On all that tract of land, known as 'West Hopewell,' shown on a plat by LaPrade & Brothers.

"4. And also on any other land which the parties of the first part may hereafter determine to rent out, sub-divide, or sell, which is owned by them, and which lies west of the streets, known as Bonnacord street and Bermuda street, to the Appomattox river, as shown on the aforesaid plat of

'West City Point,' and also on any other land owned by them and situate on the south side of the Norfolk & Western Railroad and west of the present boundary line of the property of E. I. Du Pont DeNemours & Company.

"5. Also, all of the rents arising from the land which is now or may hereafter be leased, and which is situate west of the aforesaid Bonnacord street, and also of the profits arising from the sale or grant of any rights or privileges reserved in any of the streets as shown on the aforesaid subdivision and any future sub-divisions.

"The following important covenant appears in this contract, not apparent in the former: The parties of the first part agree (page 2 of the contract) that, after termination of this agreement, they will immediately convey to the said Richard Eppes, if living, and should he be dead, to his heirs, or such persons as he shall by will designate, an undivided one-third interest in and to such of the property above mentioned, as may at the date of such termination remain unsold.

"Richard Eppes, on his part, agrees, in case of the payment to him of one-third of the gross receipts, less working expenses, arising from sales and rent, as aforesaid, and of the other covenants and agreements to be kept and performed by the parties of the first part, to supervise, manage, and conduct all business of the sisters in connection with, and incident to, the sale of any of the property herein set forth and to render a due accounting.

"The contract further provides this agreement may be terminated by either party thereto by giving six months notice to the other parties of such intention.

"I dwell on these contracts at some length because they are of fundamental importance in determining the pregnant questions in the case. It may be well to compare or contrast them. In respect to the first three paragraphs by way of recital, the two contracts are identical in their terms. The fourth paragraph of recital in the second contract varies from the language of the corresponding paragraph in the first contract by substituting for the phrase, *'net profits,'*

the words, *'gross receipts, less all working expenses.'* In the same paragraph, and in the same language, the word, *'sales,'* in the first contract has been substituted by the singular of the word, namely, *'sale.'* In the covenant, providing for the remuneration of the agent, the words, *'net proceeds,'* appearing in the first contract are substituted by the words, *'gross receipts, less all working expenses,'* in the second contract, and the word, 'of,' takes the place of the word, 'from,' in the first contract. Paragraphs 1, 2, 3, denoting specific subjects to which the contracts are to have application appear in identical terms in each of the contracts. Paragraph 4, in the second contract, contains another notable variation from the language of the corresponding paragraph in the first contract. For instance, the first contract refers to, 'any other land, which the parties of the first part may hereafter determine to sub-divide and sell, * * * owned by them,' lying west of what is known as Bonnacord street and Bermuda street. The language of the corresponding paragraph in the second contract enlarges, for one reason or another, the scope of this clause by designating, 'any other land,' which the parties of the first part may hereafter determine, *'to rent out, sub-divide, or sell,'* lying west of Bonnacord and Bermuda streets *'to the Appomattox river.'* The sixth paragraph further designating the subject to which the two contracts are to apply enlarges the scope of the profits to be calculated, arising from the activities of the agent, by specifying that such profits are to be taken with reference to, 'the sale or grant of any rights or privileges,' reserved in any of the streets, etc., as shown on the specified sub-division or any future sub-divisions. The last of the two contracts sets forth the undertaking of the sisters, Mary and Josephine, at the termination of the contract, to convey to Richard Eppes, if living, and should he be dead, then to his heirs, or appointee, an undivided one-third interest in such of the property above mentioned, as may have then remained unsold. I have already re-

marked upon this paragraph as being in itself a singular departure in the second contract from the terms of the first.

"Richard's undertaking in the second contract is, in consideration of the receipt by him of one-third of the 'gross receipts, less working expenses,' in lieu of one-third of the 'net profits,' and of the other covenants and agreements to be kept and performed by the sisters, to supervise, manage, and conduct all business incident to the sale of any property herein set forth, and to render a due accounting. These differences between the two instruments are important to the construction of the rights of the parties.

"A deliberate substitution of one expression for another where a contract is renewed, or novated, cannot be ignored. . Inquiry then arises as to the distinction between the terms, *'gross receipts, less all working expenses,'* appearing in the second contract as contrasted with the terms, *'net profits,'* which was the expression employed in the first contract.

"Counsel for the respondent have animadverted upon the difficulty of determining profits, particularly in the case of a partnership where there is no original valuation of the substantial contribution to the capital assets. There is, it is true, no valuation of the lands which were the subject of this development and constituted the contribution of the sisters, as it were, to the business. I have said that it was apparently negligible. It is entirely competent, in a partnership association, for one person to contribute services, while another contributes money or property to the social assets. But is it to be said that the word, 'profits,' is to be without its proper significance, as used by the parties? It is not necessary to ascertain the characterization of the relationship between the parties, as that of partners, to interpret these terms under the circumstances of the case. The whole result of the development, considering the *insignificant* value of the original estate, was in one sense of the word, 'profit,' as an unearned increment of the lands which the sisters owned. The receipts of the business were, practically speaking, all profits, after the deduction of working

expenses. I am, therefore, of opinion that the parties, themselves, have made clear in the second contract what may in the first contract have been, considering the contract independently of the circumstances, more or less, ambiguous. Profits are to be taken to mean, as the term is contemplated by the parties, the revenue accruing to the parties, after the costs of the operation should have been defrayed. The 'working expenses' were the expense of laying off, platting the lands, the introduction of necessary conveniences of suburban developments, perhaps, in a measure, of collecting the rents, and of the maintenance of an office and office force. The second contract, therefore, in this particular, amplifies and explains the first; and so the parties, themselves, may be said to have construed the language of the first instrument in the terms of the second. The parties have in the second contract expanded, also, the application of the contract by enlarging the subject, or more particularly by defining the subject in the fourth paragraph, specifying the scope of the operation. The first three sub-divisions specifically repeated in the second contract are, namely, 'West City Point Sub-division,' 'West City Point Addition' and 'West Hopewell.' In the fourth paragraph indicating the subject of the operation, property that may be *rented out* by the agent is included with property that may be *subdivided* or *sold* to which the first contract is limited in general terms, as the same may lie west of Bonnacord and Bermuda streets to the Appomattox river. The lands affected, then, by the line of these streets, is a line which is clearly made to intersect the Appomattox river. This must be so, because the parties take occasion to say so in express terms, leaving nothing to implication or conjecture. The sole qualification is of the extent of the land affected, so far as this paragraph is concerned. It must be such land as the parties of the first part may hereafter determine '*to rent out, subdivide* or *sell.*' The question arises touching the time when this determination is to be made; when the parties may be held to have determined to rent out, subdivide, or sell. The contract contains no limitations in point

of time, but I think, the parties contemplated that the choice should be made during the term of the agency. This being so, the further question arises, touching the nature of the evidence necessary to reflect the intention to rent out, subdivide, or sell within this period. The contract is decided in itself on this point. Undoubtedly, the instrument should be given the interpretation consonant with reason and in accordance with the circumstances. The contract does not say specifically that the property must needs have been platted and laid out in streets, or improved, by the conveniences of suburban development to be affected with this intention. None of the improvements of this kind, actually made on the premises, were durable or permanent. They were in the main superficial, and consisted of such work as was done with an outfit of teams, scrapers, etc., provided at the expense of the agent. The sales were not to have been necessarily sales of lots in accordance with any geometrical plan. The terms used are simply, 'subdivide and sell.' It may, at this point, be worth while to observe that any part of the property was for sale at any time, according to the evidence, in practically any form, at a sufficient price, even those areas or spaces denoted as, 'Reserved,' about which the controversy in this case is waged in some of its phases. The market was rising to its culmination, and the acute question was, whether at any given time it would be advantageous to let the various parcels of land go, or whether better to hold the same on the chance of rising prices. To quote again the witness Tylar, who was constantly on the scene, the reason for the reservation from current sales of parts of the land, was evidently to avoid the hazards of wholesale auction. The parties were too wise to 'put all their eggs in one basket.' They preferred rather to await the more favorable market which they expected.

"The map of West City Point Subdivision is in evidence, 'Exhibit 1,' with the answer of Mary Eppes. The map of West City Point is in evidence, as 'Exhibit 2,' with her answer. The map of the City of Hopewell is also in evi-

dence with the said answer. The map, made August 23, 1915, of City Point and adjoining territory, belonging to the estate of Dr. Richard Eppes is in evidence. On this map, Bonnacord street runs in a southerly direction from Railroad avenue, lying parallel to the northern side at the right of way of the Norfolk & Western Railroad, to Appomattox avenue. Bermuda street, while not a prolongation of Bonnacord street, runs from the northern side of Appomattox avenue, at its intersection with this avenue about the length of a lot to the east of the intersection of Bonnacord street, and extends to the southern shore of the river where it terminates in an intersection with Riverside avenue. Riverside avenue skirts the southern shore of the river in an easterly and westerly direction. This map was made by LaPrade & Sons under date of August 23, 1915. So far as this map is concerned, Bonnacord and Bermuda streets are thus easy to find, constitute a boundary exactly definable, and afford a clear and distinct delineation of the lands developed and to be developed, so far as they may be taken in accordance with the language of the contracts, to lie west of Bonnacord and Bermuda streets. The railroad's right of way is one terminus of this boundary; the Appomattox river is the other. The map of West City Point, made by LaPrade, under date of June 9, 1915, 'Exhibit No. 1,' with the deposition of R. E. Potts, a witness for the respondent, does not differ essentially so far as the demarcation of the lot and block are concerned from the map of Dr. Richard Eppes' estate. The lines of the streets are likewise shown. Bonnacord and Bermuda streets are indicated —Bonnacord having a width of 50 feet. There is this difference between this plat and the plat of the Dr. Richard Eppes' estate. Certain areas and lots bordering on Railroad avenue have, on the LaPrade map of West City Point, been colored by the use of yellow pencil in Blocks 22 and 23. The whole of the area lying along the Norfolk & Western Railroad likewise is colored in yellow. There is faintly visible through the yellow tinting the word, 'Reserved.' This inscription also appears on the southern portion of

Blocks 22 and 23, and upon a considerable area of irregular shape lying along the Appomattox river and north of Riverside avenue and to the west of Hopewell street and Block No. 12. There is, also, an irregular space in Block No. 22 on this plat, marked in black. Other lots, also, located here and there throughout the plat in various blocks are colored in red and yellow without any explanatory inscriptions or symbols. 'Exhibit J,' purporting to be a plat of West City Point of June 9, 1915, shows an irregular area on the blue print, marked 'Reserved,' along the Appomattox river and north of Riverside avenue. The strip of land lying along the north of the right of way of the Norfolk & Western Railroad is marked, 'Reserved.' The southern portion of Blocks 22 and 23 on this plat, north of Poythress avenue, and the two blocks south of Poythress avenue, contain no inscriptions. Bonnacord street appears on this map as running from the northern line of the so-called 'Reserved' area adjacent to the line of the Norfolk & Western Railway to Appomattox avenue, and Bermuda street proceeds from Appomattox avenue to the so-called 'Reserved' area along the Appomattox river. Taking the map of Dr. Richard Eppes' estate, which seems to be the general survey, and tracing the history of the property so far as it is manifest in the course of the platting of the property, we can obtain an excellent idea of the vagaries of the wholesale development of this property. There is, for instance, a plat also in evidence, showing 'lots lying along the Norfolk & Western Railroad opposite Hopewell Station,' in an area entered at intervals by Woodlawn street, DuPont street and Hopewell street. The first sale of any lots undertaken by Misses Mary and Josephine Eppes in the project of the development was in 1915. This was under the superintendence of Richard Eppes. The reserved area appears to be a mutable quantity, varying to suit the convenience of the parties in the course of events.

"I am of opinion that it may be fairly said to have been in the contemplation of the parties, under the contract between the parties, that the rights of Richard Eppes, Agent,

whatever they may have been, attached to all the property between the Appomattox river and the right of way of the Norfolk & Western Railroad, lying to the west of the boundary given as Bonnacord street and Bermuda street. The question now arises, whether or not, if this be true, the area marked, 'Reserved,' that is, the property lying to the north of the railroad and along the line of its right of way and westward of the Bonnacord and Bermuda streets and the area along the Appomattox river, marked, 'Reserved,' lying to the north of Riverside avenue and to the west of Lot No. 12, are to be taken out of the operation of the contract, as not answering to the description of lands such as the parties of the first part in these contracts had determined to 'subdivide and sell,' or, in the language of the second contract to 'rent out, subdivide or sell.' Property, I opine, rented out, although not to be subdivided or sold, would give to Richard Eppes certain rights. Property subdivided likewise gave him certain rights, although not to be rented out or immediately sold. Property to be sold, although not to be rented out, or to be subdivided, would also give him a certain interest. How, therefore, is this interest, whatever it may have been, affected by the designation of any portion of this area on any of these plats as 'Reserved'? Reserved to what ends, or in what respect, is the question which meets us at the threshold.

"Counsel for the respondent contends that the word, 'Reserved' *ex vi termini* completely eliminates in any view of the contracts the area indicated as 'Reserved' from the operation of the contract; that the Richard Eppes' estate is excluded from any participation in the property embraced in these areas. They cite the case of *Grant* v. *Davenport,* 18 Iowa 179, 186, 187. In the City of Davenport, in front of Block No. 61, between Brady and Perry streets, and between Front street and the Mississippi river, was a tract not laid off in lots, marked with a line, separating it from the street or levee and designated as 'Reserved Landing.' The court held that the tract marked, 'Reserved Landing' on a plat of the premises, was not intended by

LeClaire, the donor, to be appropriated to the public. His grant was for 'the streets, alleys and public grounds for public purposes.' There were other public lands on the river other than that reserved to which his language could apply. The court expresses its views on the question:

" 'Why reserve for the public that which was already sufficiently appropriated without the use of such language? * * * If such had been the case, the intention would have been clearly stated by the donor. The language of the donor is, "Reserved Landing." Reserved by whom? By the public? Certainly not, for the public never had it. For the public? It is not so said. If he had said, "Reserved," without adding for the purposes, it could not be claimed that it was by this act given to the public. The language of the donor is entirely consistent with private reservation.'

"The difference between that case and the case here is obvious. The question here is as to the significance of the word, 'Reserved,' so far as affecting the rights of parties to a contract in which no purpose in the reservation is indicated on the plat whether for public or private uses. The question recurs: If the property were reserved from the sale on any temporary occasion, was it *ipso facto* reserved from all future sales so far as the contract between the parties is concerned? Was it indefinitely reserved? Was it permanently reserved? Was it forever reserved? So far as Richard Eppes was concerned, it does not so appear upon a fair interpretation of the testimony. The respondent, testifying in her own behalf, plainly infers that all her property was for sale at a price at this time, and that she refused an offer of $80,000 for the railroad strip because she thought the price was inadequate, not because the property was not for sale as appearing on these plats. It is moreover in evidence that the property on Railroad avenue as shown on these plats was the subject of lease-holds. Although temporary and ephemeral they may have been, it was 'rented out.' Parcels of land in the Railroad avenue strip were let to tenants as an incident of the urban development of which they were a part.

"In the case of *Fort Smith, etc., Bridge Dist.* v. *Scott,* 3 Ark. 449 [111 Ark. 449, 163 S. W. 1137], it was held that the word, 'Reserved,' denoting an irregular strip of ground lying between Water street and the banks of the river, did not necessarily indicate an intention on the part of the proprietor to dedicate it to the public. The court held that the word, 'Reserved,' excepted the area thus specified from the operation of the gift, and that it was accordingly not to be regarded as dedicated to the public. This would appear to be perfectly clear. The two cases cited hold simply that a *dedication to the public use* cannot be inferred from the use of the terms, 'Reserved for public landing,' or 'Reserved' as designating a space on platted property. The property although thus denominated still remained the property of the owner of the original area. The question recurs: What was the purpose of the parties in the case at bar in indicating certain reserved areas, contained in the plats filed in this case? The witness Tylar testified that they were not to be sold at the time, that the other property indicated on the plats was to be first exposed to sale, but not that they were not to be sold at all when the demand should afford the parties an adequate price.

"In other words, a reservation may except an area from the operation of a grant where it plainly appears to have been so intended. Cases so holding, however, do not touch the question here, where no public rights are involved. We are concerned alone with the rights of parties to a contract, looking to the use and disposition of the premises, for all that they may have been marked, 'Reserved.'

"Witness Tylar, from his knowledge of the operation, and his association with the parties, testifies that:

" 'It was the intent of the parties that Eppes (Richard) would receive at his death, or the termination of the contract, one-third of all lands west of the line of Bermuda and Bonnacord streets, from the N. & W. Railroad to the Appomattox river, and extending through South Hopewell to Cat-Tail Creek.'

"He says moreover that:

" ' "Reserved," (for instance in Exhibit 2) means that the reserved area was excluded from the operation of the contract with the National Land and Auction Company, who were the first auctioneers for Richard Eppes.'

"This is more than a plausible statement. It was no more than reasonable that, in the first public auction of the property, the parties may not have been willing to hazard too great a stake in the first public experiment of an auction sale, and that the space in question was reserved for the time being to suit the future occasions of the parties. This is not to annul the character of the property as being, nevertheless, still subject to sale, subdivision, or leasing.

"So much for the terms of the contract, abstractly considered—that is, without reference to the circumstances. Under the authorities which have already been mentioned, allowing the courts to consider the usage and habits and practice of the parties, themselves, in the application of the contract, it remains to consider what light may be derived from this source in determining the relationship of the parties. The transactions of Richard Eppes, Agent, have been pretty fairly recorded in an account, which he, himself, kept, and which was audited at intervals by the witness, E. W. Tylar, whose competency, intelligence, and fairness are not drawn in question. This account was, on the motion of the respondent, herself, subjected to an audit by the court, which has been duly filed, and of which mention has already been made. The work was done by A. Lee Rawlings & Company, a firm of certified accountants, with offices in Norfolk, Richmond and Raleigh. This audit disclosed, it may be observed, at the outset, an apparent liability or deficit on the part of 'Richard Eppes, Agent,' as the heading under which Richard Eppes kept the account, of $6,776.13, as the result of his operations from April, 1915, to March 27, 1922. Several hundreds of thousands of dollars had passed through his hands in this interval, representing the proceeds of the various activities carried on by him on behalf of his sisters, the Misses Josephine and Mary Eppes.

"The auditor notes on page 4 that the total net profits from the operation of the joint business amounted to $398,-709.90, accruing between April 13, 1915, to March 27, 1922. This fact will afford some idea of the magnitude of the business which Richard Eppes, Agent, had in charge. The auditor in his remarks on the history and scope of the audit, makes this observation with reference to the apportionment of the proceeds of the business:

" 'All income and profits were credited on the books to an account called, "Undivided Income and Capital" * * *. The distributions were made consistently on a basis of two-thirds to Josephine D. and Mary Eppes, and one-third to Richard Eppes, with the exception that on March 31, 1920, the individual account of Richard Eppes, charged to "Undivided Income and Capital" exceeded one-half of the joint account of Josephine D. and Mary Eppes by the sum of $6,776.13.'

"While the books indicate that the profits from operation were distributed on the basis of two-thirds to Josephine D. and Mary Eppes, and one-third to Richard Eppes, no partnership income tax returns were filed for any of the years involved, but instead, individual tax returns were filed for Josephine D. and Mary Eppes and Richard Epes, in each of which returns one-third of the income and expenses of the business in question was reported.

"This was the uniform and consistent method observed by Richard Eppes, Agent, in the payment of dividends, or in the making of distributions among himself and sisters, Mary and Josephine. The witness Tylar testified to the same effect, and also to the fact that he, himself, at intervals rendered statements to each of the three parties, as the account was audited by him from time to time. I state this as a fact because it cannot be seriously doubted under the plain testimony in the case. The sisters, therefore, knew then that Richard was the beneficiary of a *tri-partite* distribution, made equally among the three parties to the contracts. This distribution was made of the *residuum* or balance remaining to the credit of the account after operation

or working expenses had been deducted. One of the periodical accounts mentioned, rendered by Mr. Tylar, was examined by the auditor, 'covering the period from inception of the business to August 31, 1915.' This report, as well as contemporary reports, made by J. M. Culbreth, another public accountant, who it seems occasionally audited the books of the agency, showed the accounts on the same basis as stated by the books of the concern. Culbreth, thus, expressly corroborates the express testimony of the witness Tylar. The funds entering into this account were obtained by Richard Eppes from the sale and renting of the property. 'The working expenses,' as treated by him were no more than what is comprehended within the term 'overhead,' of recent origin. In other words, it was the net fund remaining, as ascertained periodically, of all the income from the several properties of which he had supervision, after all costs attending the operation had been defrayed. This is the construction of the parties as to the intent and meaning of the contract in this particular, and leaves nothing to conjecture in order to the determination of the significance of the expression 'working expenses.' The profits mentioned in the first contract were no more than the receipts less the working expenses as thus defined, for there was no capital charge to represent the contribution made to the enterprise by the sisters on the score of a partnership relationship, if partnership were the character to be impressed on the relationship of the parties, a question which I do not think it important to determine.

"I have reached the point where it becomes necessary, under the pleadings in the case to determine the interest inuring to the benefit of the estate of Richard Eppes on his death on March 27, 1922. The conclusion is a consequence of the premises which have been hitherto discussed. Miss Mary Eppes, testifying in her own behalf, does not gainsay the facts which have been shown by the audit. These facts are not susceptible to contradiction whatever the inferences that must be drawn from these facts. She, as nearly as can be made out from her testimony, seem-

ed to consider that Richard Eppes had some obscure, indefinable life interest in the property, which terminated at his death, except, as admitted by her, a definite interest in the lots specified in the deed of December 31, 1924, of which I shall have more to say hereafter. It is, therefore, to be assumed as a fact for the reasons already indicated that, in all the rents, issues, and profits, so to speak, arising from the real estate operations of Richard Eppes, Richard Eppes had a determinate, vested interest with respect to which, it appears, at the date of his death he had been satisfied, leaving him, according to the auditor, indebted to the common or general estate, in the sum of $6,776.13, as set forth on page 2 of his report. This is a major premise on which I am constrained to rely. To this, I see no reasonable alternative. We are not without specific evidence *aliunde* bearing upon the question. Acts or declarations of parties, especially when they are contrary to interest or repugnant to interest, done with a full and contemporaneous appreciation of the circumstances are of peculiar force. It is, also, true that, when evidence pertinent to an issue is in the peculiar possession of the party who declines or refuses to produce it, it is to be presumed that such evidence, if produced, would tend to the confusion or prejudice of the party who fails to disclose it.

"This rule has been long recognized in Virginia, and is in accord with reason and justice. In the case at bar, there is certain evidence which has been produced before the court in secondary form upon the refusal of the defendant to produce the original. Upon the death of Miss Josephine D. Eppes on March 27, 1920, it became necessary that her executor should file an estate or inheritance tax with the Collector of United States Internal Revenue, at Richmond, Virginia. Her executor (for she died testate, making Mary Eppes, the respondent here, her devisee and legatee) was Mr. William L. Zimmer. Mr. William L. Zimmer departed this life several years before the institution of this suit. His son, Samuel W. Zimmer, a distinguished lawyer at the bar of the city of Petersburg, was his counsel in this capac-

ity. His son, also, was counsel for Richard Eppes during his lifetime. Mr. William L. Zimmer was an intimate friend of the family, and lent his advice to the sisters in conjunction with Richard Eppes in the real estate operations with which we are concerned. Mr. Samuel W. Zimmer and his father were both, as the evidence unmistakably indicates, plainly familiar with the two written contracts, as they were with the details of the practical operations of Richard Eppes pursuant to these contracts. They, together with E. W. Tylar, Richard Eppes' auditor, were in intimate contact with the business while the feverish development was in progress. Neither of them occupied the position of a stranger, or a mere casual spectator or observer. Each might in turn have said with respect to the affairs of this development, *'Magna pars fui.'* They were in the thick of it, so to speak, all of them actively engaged as consultants, advisers, counsellors, and the witness Tylar, as auditor as well. All bore a confidential relationship, therefore, to the three parties to the contract.

"In the preparation of the federal and state tax, therefore, Mr. Zimmer, as her executor, must have proceeded with full knowledge of the agency and its accounts. It was impossible under the rule of the United States Department of Internal Revenue for the complainant here, so it is testified, to obtain access to the return of Josephine's executor, filed with the department for the purpose of computing the federal tax on the property. Miss Mary Eppes, alone, as the beneficiary, so it appears, would be permitted to see this document. The original sketch of this return as prepared by Mr. Zimmer from which the final return was compiled, is signed by him, as the witness Tylar testified. It shows that the property in which the decedent was interested, and for the tax on which her estate was liable in the City of Hopewell was:

"A 1/3 interest in 125 vacant lots.

"A 1/3 interest in 2 lots and 3 houses.

"A 1/3 interest in a strip of land on the Appomattox River.

"A 1/3 interest in ½ of Block 1 and brick-frame building.

"A 1/3 interest in ½ Block 2.

"A 1/3 interest in Block 3 and in frame building.

"A 1/3 interest in Blocks 22 and 23.

"In South Hopewell a similar one-third interest is listed as well as 417 lots in Bland district. In City Point proper (old City Point) outside the theatre of the real estate operations under the contracts, her interest as set down is a one-half interest. These entries were made by one who, having been the confidential consultant and assistant of the parties in their joint lifetime, as I have mentioned, became the personal representative of one of them at her death. The return was made from information which he gained, therefore, at first hand. It was made under oath. It is presumed to be correct and cannot be considered as embodying the opinion of a stranger whose statement might be merely a matter of hearsay. This return is filed in the record as 'Exhibit U' and is accompanied with a letter from witness Tylar to Richard Eppes, in which the witness Tylar, on March 25, 1921, attests to its correctness, except in one or two details, which were susceptible of alteration, but would not affect the result. Nor is this all. 'Exhibit F' filed with the record is a certified copy of the inventory and appraisement of the estate of Josephine Epes, signed by William L. Zimmer, her executor, as well as by the appraisers, R. F. Ruffin and others, dated the 23rd day of April, 1928. This appraisement shows that the interest of Josephine D. Eppes, deceased, in the common property, as of her death, with respect to the property with which we are concerned here, is ascertained as a one-third interest. The appraisement conforms essentially with the return made to the Collector of Internal Revenue. The unavoidable conclusion from these documents, which the court thinks are highly pertinent and strictly relevant, is that the other two-thirds interest was an interest to which Richard and his sister, Mary, on their part, were apparently entitled. This, in fine, is the complainant's contention. It is fitting that

the solemn declaration of William L. Zimmer should be here recorded, as signed to this inventory:

" 'I herewith return the foregoing appraisement as a correct inventory of the real and personal estate of Josephine D. Eppes, deceased.

" '(signed) WILLIAM L. ZIMMER,

" 'Executor for Josephine D. Eppes, Deceased.'

"Nor is this all. Upon the death of Richard Eppes, Samuel W. Zimmer and the complainant qualified as the co-executors of his will. It became necessary as incident to the administration of his estate that they should likewise file a return of the property and effects of his estate with the office of the same federal agency for the purpose of ascertaining the estate or inheritance tax, as had been done in the case of his sister, Josephine, some two years before. The witness Tylar, at the request of Mr. Samuel W. Zimmer, prepared a sketch of the schedule for his benefit. Tylar did not make a complete draft, but indicated merely the mode in which the liability of this tax should be stated. Writing to Zimmer by way of giving him the proper cue for the preparation of the returns, Tylar begins the draft with the monition: '1/3 undivided interest in 125 Hopewell lots, etc. (Copy, Josephine D. Eppes).' His evidence is that an inventory of the real estate taken from Josephine's return was attached to this rough draft, and that it was to the return in the case of Josephine Eppes' estate that Zimmer's attention was directed, in order to complete the document. Witness states that he did this because he knew that Zimmer had the schedule in the case of Josephine D. Eppes in detail in his possession, and that it would have been superfluous to copy the description of all the several parcels. This tax schedule for Richard Eppes' estate was filed on November 23, 1934, in Richmond, Virginia, signed by Samuel W. Zimmer. The draft of the return to be followed by Zimmer in the case of Richard Eppes, as outlined by the witness Tylar, is filed in the record as 'Exhibit X,' with accompanying documents, to which the witness Tylar referred.

"Tylar further testifies that it was not until proceedings in the suit of *Richard Eppes' Creditors* v. *Richard Eppes' Estate* had been brought in Prince George county in 1928, that he discovered that his directions to Zimmer had not been followed by the latter, and that the return as actually made by Zimmer failed to recognize the one-third interest of Richard Eppes' estate in the unsold property in controversy here. Zimmer died some years ago before the institution of the present suit. Richard Eppes, himself, likewise, is dead. We are left, therefore, to consider the record as made up. This record, except for this departure from the *indicia* of the audit and the other evidence in the case, is consistent only with the theory that an undivided one-third interest in the property in question survived to the estate of Richard Eppes.

"Miss Mary Eppes, when testifying in her own behalf, refused to produce her income tax returns for the years 1915 to 1922 inclusive. This for reasons sufficient unto herself. It will not do to say, as I again observe, that the respondent, Mary Eppes, is not bound by the acts of her sister Josephine's executor, that as to respondent his act was but *res inter alias acta*. He was more than the sister's executor; he was a person who had been intimate with the parties in their business through the vicissitudes of its amazing history, and must have proceeded with an intelligent judgment and knowledge of the facts. It is not to be expected, of course, that an elderly lady, as was Miss Mary Eppes, when subject to cross-examination, should have weighed all her words, should have proved as discreet and prudent, and as capable a witness, although manifestly a very intelligent witness, as another person of greater experience of practical affairs. One statement made by her on the witness stand, nevertheless, is too plain and ingenuous to be overlooked and cannot be misunderstood. She seeks to confine the interest of the Richard Eppes' Estate to West City Point and West City Point Addition, which had been practically sold and disposed of before the second contract of July 29, 1918, was entered into. In the course of her cross-examina-

tion, the respondent thus deliberately records herself, in answer to a question on the part of the counsel for the complainant:

"'Q. Miss Eppes, if it is shown that Richard Eppes' share paid or bore items which were properly chargeable to your sister and yourself through careless or erroneous construction of the terms of this contract, would you want to keep that money—money that belonged to him, or will you pay it over?

"'A. My answer is the same that I gave just now: I consider everything settled.

"'Q. Miss Eppes, then I understand you, regardless of what rights are shown to belong to Richard Eppes, you insist on retaining all the properties real and personal, which you have?

"'A. Yes.'

"This is to take high ground, and yet, the witness is entitled to stand on her legal rights, even though it does, nevertheless, evince a rather stern and harsh attitude towards the complainant in this case—one which would indicate, were nothing else apparent in the record to confirm the opinion, that the respondent bears little good will towards the complainant. I say this with a full realization, however, that the complainant's rights are to be determined according to the evidence and the principles of the law properly applicable to the evidence, and that the personal animus of the respondent is not to compromise or prejudice her interest whatever may be its effect otherwise in determining the credibility of her testimony. Her testimony may, thus, peradventure, indicate that the construction with which she at present seeks to impress the contract, so contrary to the former view entertained by her associates as well as by herself, may be an afterthought, in which her reliance may be more artificial and technical than sound or just.

"The language of the second contract of July 29, 1918, refers to the interest of Richard Eppes at his death, or at the termination of the contract upon six months notice

in his lifetime, as pertaining to such property as the parties of the first part might thereafter determine 'to rent out, subdivide, or sell' lying west of Bonnacord and Bermuda streets to the Appomattox river. Thus, this undivided one-third interest, is to be an interest, as I deem it, in such of the property within the scope mentioned as might be rented out, subdivided, or sold, and eventually, in the very language of the instrument itself, in all that at the termination of the contract, should remain unsold. If the property were rented out, his one-third reversionary interest was in such property as might have been rented out, although not subdivided or sold; if the property were subdivided, his one-third interest touched such property as might have been subdivided, although not rented out or sold; if the property were sold, his one-third interest affected such property within the scope contemplated, as might remain unsold, although not rented out or subdivided. Much of the property might never be actually sold or subdivided or rented out, yet it might be clearly within the scope of the contract, and he would be entitled to the ultimate one-third interest in the fee. The right to this interest is absolute with respect to the localities specified in the first, second and third clauses of recital. With respect to lands lying west of Bonnacord and Bermuda streets, noted in the fourth paragraph, his right is contingent upon the determination or intent of the sisters to rent out, subdivide or sell any integral part of the area. This intent and purpose is the criterion; once this intent is manifested to rent out, subdivide or sell within any such area, the right is established.

"It is, therefore, necessary and proper for us to consider the uses of the properties in question with reference to the terms of the contract, as having been rented out, subdivided or sold. Much of the evidence and considerable contention, also, dealt with uses of Railroad avenue within the confines of the Railroad avenue strip. The evidence shows that one extremity of this strip was subject to a concrete and specific improvement. Three storehouses were erected at the instance of one Chakales. Richard Eppes, undoubtedly, was

the active agent in the transaction whereby these brick stores were constructed in what is now the center of the commercial district of the City of Hopewell.

"Witness Tylar explicitly testified that Richard Eppes, between the years 1915 and 1918, opened the street known as Railroad avenue, through the 200' strip, and that, in the summer of 1918, he commenced a new street to take the place of Railroad avenue, deeming Railroad avenue to be too near to the south line, and built the brick stores adjacent to the corner of the N. & W. right of way. His project was interrupted by the end of the war.

"In 1928, it seems, the work of improvement, initiated in this vicinity by Richard Eppes in 1918, was resumed. This was in accordance with the reservation by Mary Eppes of her right to do so, when in 1923 she leased part of this land to the City Point Supply Company. This right was expressly reserved in the lease to the City Point Supply Company in 1923, in order to enable her to further carry on the development of the thoroughfare. But this street had been open in 1918.

"Tylar states the occasion for the additional development of the 200' railroad strip in 1918, including Commerce street improvements. The object was to create salable lots.

" 'Q. Why was this (development or improvement) done?

" 'A. Because we had nothing to sell on Broadway.'

"Richard Eppes was alert to the common interest. These stores appear to be, in fact, the only permanent, substantial buildings that have survived the change of times. Some of this property was subsequently leased through the agency of Richard Eppes to the City Point Supply Company, a corporation organized by Richard Eppes, in which the two sisters and he were apparently equal shareholders to whom stock was issued in this proportion. This parcel of property upon the cessation of the City Point Supply Company was afterwards acquired by W. L. Broaddus through an assignment of the lease held by the City Point Supply Company. Some adjustment of the street in this vicinity was necessary in the

course of the building of these stores; there were side-walks to define; the street in the vicinity was altered at the ends to give it a width of sixty feet whereas its width throughout the major portion of its course was but fifty feet. Telephone lines were admitted to this sector, and preparations were made for the introduction of water and sewage. This operation was undoubtedly *quoad hoc* a development of the property, and, in effect, a sub-division and platting of the *locus in quo* to the extent of the rearrangement of the street. An attempt was made to lease or grant a portion of the property in this strip to the city of Hopewell for a fire station. There was a wood yard and coal yard in the vicinity to which access was had through the Railroad avenue strip. A street was platted or laid off through the Railroad avenue strip. The improvement of the property in this particular was paid for out of the joint agency account of the three parties. I am of opinion, considering the testimony of the witnesses, R. C. Potts, E. W. Tylar, and the complainant, as well as the other evidence bearing on this phase of the case that the Railroad avenue strip was devoted, in spite of any temporary reservation from an auction sale, to the purposes of urban development; that the parties intended, to use the language of the contract, that it should be rented out, sub-divided, and sold, although the final form which Railroad avenue assumed did not take shape until after the death of Richard Eppes, perhaps, when the later and more permanent improvements were made on the *locus in quo,* and Commerce street was recognized as its lineal and legitimate successor. The genesis of the development was but emphasized by the subsequent improvements, carried to a complete and perfect issue after the city of Hopewell had been chartered and its configuration had become a matter of municipal policy in this, as in other quarters, of the municipality. These facts, I am of opinion, establish the character of the Railroad avenue strip, as a parcel of the property in which Richard Eppes was entitled to

the reversionary interest of one-third at his death, or upon the prior termination of the contract.

"There is still another circumstance worthy of notice. In May, 1931, at the instance of the authorities of the city of Hopewell, a warrant was issued against the respondent, charging her with what appears to have been maintenance of a nuisance in violation of certain regulations of the building code. It seems that a structure on Kippax street, in the West City Point Sub-division, had been condemned by the authorities, as being obnoxious, or unsafe, or for whatever reason. The respondent summoned before G. O. Tayloe, at that time the civil and police justice of the city of Hopewell, to answer the complaint, appeared and pleaded in abatement to the warrant, assigning as her reason that the proper parties defendant were not before the court; that Richard Eppes' estate possessed an interest in the property as co-owner; and that Mary Van Deusen Eppes, as his personal representative should be made co-defendant. The complainant was accordingly thereupon summoned as co-defendant. In the sequel, the building was removed by the witness, R. C. Potts, acting on behalf of the respondent as her agent. Kippax street extends from Appomattox river to the right of way of the N. & W. Railroad, and lies to the west of Bonnacord and Bermuda streets, as appears from the map, 'Exhibit M. L. G. No. 2' in the record. The complainant, by virtue of the position voluntarily taken by the respondent in this proceeding in answering the said warrant, urges an estoppel of record against her claim in the case at bar that Richard Eppes' estate was not entitled to a one-third interest in the property in question. The complainant contends that her plea in the police court was a deliberate declaration by the respondent, admitting the interest of the testator, Richard Eppes, in this property and in derogation of the respondent's present attitude towards the plaintiff's demand. There is force in this argument. The respondent's position was assumed by her

*ante litem motam,* and did, in fact, operate as such an admission unless its effect can be averted by a reasonable explanation. The explanation made by counsel for the respondent in this cause, is that her position in the police court was technically correct, in that, while the legal title of record to the property was, in fact, vested in the respondent until the property should have been partitioned as was afterwards done by the deed of December 31, 1924, the proper parties defendant to the warrant were actually, Mary Eppes, in whom the legal title of record was thus vested, and Richard Eppes' representative, who was apparently entitled to a reversionary or latent interest jointly with the respondent in all the premises. Such was the apparent import of the contract between Richard Eppes and the sisters.

"I do not think this explanation altogether satisfactory. The proceeding in the police court did not involve title to property merely. It was a proceeding to abate a nuisance, and the person or persons contributing to the nuisance should have been properly defendants. The determination of the status of the mere legal title was not in issue. The real issue concerned the responsible authors of the nuisance, and the responsible authors of the nuisance were the parties who, as active or beneficial owners of the property, had suffered or permitted the nuisance to exist. A trustee clothed with the mere naked title is, for instance, not the party liable for the condition of a building. The owner of the building itself, entitled to the beneficial or equitable interest, to the user of the building, is the real party, and so if Richard Eppes' estate were made a party to this proceeding at the instance of the respondent, the reason for this —and a sound reason, take it—was that Richard Eppes' estate was as much responsible for the conditions as was she, herself, since she and his personal representative were jointly and equally culpable, if culpable at all. The proceedings in the police court, therefore, must be taken to operate as a positive assertion by the respondent as

late as May, 1931, that Richard Eppes' estate was jointly seized with her of a beneficial or equitable interest in the property on Kippax street in West City Point Subdivision.

"There is further confirmatory, circumstantial evidence in favor of the construction of the contract, the one as of the other, as entitling the estate of Richard Eppes to a third of the proceeds of the property, and as contravening the respondent's contention that he has no interest in the *locus in quo* beyond the area comprising the lots which were the subject of the deed of December 31, 1924. Without expanding this opinion beyond necessary bounds, this evidence is to be found in the fact that she did finally, by the deed mentioned, undertake to convey to him fifty-one lots, 'in carrying out the contract;' that she did after his death pay to his estate certain money derived by her from the sale of certain rights and franchises in order to the establishment of certain streets in the city of Hopewell; that she did pay to him money collected by her on certain notes, payable, I believe, as the record shows, to herself, but notes acquired by the agency in the course of its operation; that she did pay to him certain money as his share of the proceeds of certain notes, made by I. M. Warren; that she did pay to him certain moneys collected by her from the gas company for a franchise to lay its pipe in the 200-foot strip, that is to say, in Railroad avenue. * * *

"It seems, too, that certain parcels in the area claimed as 'Reserved,' were let originally by Mary Eppes to the Old Dominion Gas & Electric Corporation and to the water company, or their predecessors. The proceeds of the final conveyance to these public utility companies in 1927 and 1928 were divided by Mary Eppes, who gave to Richard Eppes' estate one-third of the purchase money. This was four (4) years after the death of Richard Eppes. These parcels of land were identical with the space, marked in black on the map, 'Exhibit No. 1,' with the deposition of R. C. Potts, of which men-

tion has been made. His estate could have been entitled to an interest in these lands only on the hypothesis that he had a definite interest in the land itself in virtue of the contract, and that the 'reserved' area was, therefore, within the purview of the contract.

"These payments, be it noted, were made by the respondent after the death of Richard Eppes, and can be explained only on the theory that they were a *douceur* or donation, pure and simple, or else as I have observed, proceeded from a sense of obligation. If so, the obligation is to be referred to the contracts under which the decedent was employed. It is not imaginable, under the circumstances and is not claimed, indeed, that these payments were in the nature of a gift. Another circumstance, a significant circumstance, manifest in the record is, that the receipts of sales and rents as collected by Richard Eppes, were deposited to the account of 'Richard Eppes, Agent.' The distribution or apportionment of taxes was as against an ownership account, as contradistinguished from a partnership account, and the taxes were returned on this basis with respect to the three parties. The income was divided into three parts and the expenses into three parts, each party reporting a third of the estate, thus apportioned for taxation. 'This was according to the instructions of all three parties.' (Witness Tylar, * * *.)

"The first return under this arrangement was in the spring of 1916, after a consultation by the witness with the parties at the Appomattox Manor. Counsel for the respondent is basing his claim upon her testimony that there were not only two written contracts, mentioned in this opinion, but that there was also an antecedent, parol agreement, entered into by the two sisters and their brother in the first instance, upon his summons to their aid from the city of Petersburg, where he was then engaged in business. Under this agreement they contend that until the date of the first written contract of February 21, 1916, he was employed by the sisters

as their factotum at a salary of $150.00 a month, and no more, and that, in his exiguous circumstances, he cheerfully accepted their proposal of employment at this wage. I find no sufficient evidence in the record on which to base this claim. He seems to have received— that is, he or his wife, at intervals throughout the period of his labors until his death—the specific sum of $150.00. I again invoke the testimony of Tylar, on which, for reasons already stated, I place much reliance, as that of a detached and apparently unbiased witness, unaffected with any interest in the result of this case. He testified that the earliest engagement between the parties was an oral agrement, which accorded to Richard Eppes a third of the rents and a third of the proceeds of the sales, and that the sisters were apprised that emoluments were to be allowed him on this basis because, as he testified, he rendered to the sisters reports of such transactions, showing this division for some months without objection on their part. The respondent, testifying in her own behalf, denies that this was the case and disclaims any knowledge of such reports. The extraneous facts seem to corroborate the witness Tylar. The audit does not, in my opinion, lend countenance to the respondent's contention. It does show payments to Richard Eppes throughout the whole course of this business, say, to the date of his death, of the certain sum of $150.00 per month. Tylar, to whom I again refer, testified that, 'after the War, Richard drew the sum of $150.00 per month, at all events in addition to his portion of the receipts, because he found that he could not live on a third of the receipts, less working expenses,' after the real estate market had begun to flag; that this salary was drawn by him before any division of the joint income had been made; and that, after the death of Josephine, the income and expenses incident to the property west of Bonnacord and Bermuda streets, were divided one-third to Richard and two-thirds to the respondent. Mr. Syme, counsel for the respondent, elicits from Auditor

Goodman, to serve respondent's theory of the case, evidence which, it would appear, repels the contention that any such scheme of stated salary could by possibility have existed. On the theory that his compensation under the arrangement with his sisters for the period ending on the 21st of February, 1916, was to be a salary of $150.00 a month, the auditor states that his remuneration, in the whole, would have amounted to but $1,650.00. On the theory that the compensation to accrue to him would have been one-third of the net profits to this date, to the date of the second contract on July 29, 1918, his compensation would have been one-third of $56,274.66, or the sum of $18,758.22. Under the third period—that is to say, the period intervening between the second contract and the death of Eppes—his compensation on the respondent's theory that his remuneration was to be one-third of the *gross proceeds,* would have been one-third of $24,462.88, or the sum of $8,154.30. (Goodman, * * *.) As a matter of fact, Goodman reports that Richard drew in cash during his connection with the business the aggregate sum of $83,074.11, and in cash, stocks and bonds the aggregate sum of $96,-914.41. If it is to be seriously contended that the dividends received by Richard Eppes in his lifetime are to be confined within the limitation of the auditor's figures, as stated by him in his answer to counsel's inquiry, the contrast between the sums to which he would have thus been entitled under the theory of respondent's counsel, and the sum actually received by him, is more than startling. The whole course of dealing of the parties, of which they were periodically advised by the auditor of the agency, is repugnant to such a claim on the part of the respondent; on the other hand, it is unimaginable that so great an incongruity could have existed without the privity and consent of the sisters and of the respondent after her sister's death. The audit of the accounts of Richard Eppes, Agent, filed in the record, is too plain to be misunderstood, and must be taken as showing the

usage and practice of the parties in the course of their dealings with one another. It may be said, besides, that not until this suit was instituted was any complaint made by the respondent of the delinquency which these figures imply on the part of the brother. The court feels itself to be on much safer ground to accept the evidence of the audit as to the rights of the parties, corroborated by the testimony of the witness Tylar, than to entertain the theory that Richard Eppes had so largely overdrawn his account. All the papers, documents and accounts of the agency were taken into possession by the respondent after the death of Richard Eppes and, until the institution of this suit, remained in her custody and under her control. The complainant had no access to these accounts, or the books or record of the agency. The contract of July 29, 1918, in evidence here, to which reference has been made, was, so testified the complainant, never seen by her until after the supposed settlement, evidenced by the deed of December 31, 1924. She declared—and I can see no reason to question her sincerity—that she was not apprised of her rights under these contracts in her ignorance of their provisions until after the execution of the deed of December 31, 1924. She testified that the first intimation she had of the contract of July 28, 1918, was when it was produced in court in a suit in chancery in the Circuit Court of Prince George County, instituted after the death of Richard Eppes by *Richard Eppes' Creditors* v. *Richard Eppes' Estate,* when it was produced by another party to the cause. The complainant and Samuel W. Zimmer, as co-executors of the estate of Richard Eppes, and Mary Eppes in her own right, were the parties defendant to the suit. Mary Eppes, as one of the original defendants, was on her motion dismissed.

"Early in the course of the development of the property, comprised in the *locus in quo,* there was a sale and conveyance by the two sisters, Mary and Josephine, to the Du Pont Company of eighty acres of land in the vicinity, for which they were paid the sum of $31,976.00.

In the final evolution of the property, a portion of this tract, re-acquired by the sisters, became part of the present site of the city of Hopewell. The locality was within the confines of what was known as West City Point. The conveyance from the sisters to the Du Pont Company was executed by them toward the end of the year 1915. This transaction took place, therefore, some months after Richard Eppes had assumed the management of the affairs of his sisters in the development of their property. I have already intimated that the early oral agreement was not predicated upon a consideration of $150.00 a month merely as a definite salary to Richard Eppes, but that it was an agreement, entitling him to an interest in the proceeds of the business after payment of expenses, and that the two successive written contracts of February 21, 1916, and July 29, 1918, were conceived, apparently, for the purpose of establishing the relations between the parties on a basis more assured and somewhat wider in its scope so as to leave little to intendment or controversy. A question to be determined in the case touches the claim of the complainant, pursuant to the contracts or rather to the first or parol contract of employment, to an interest in the proceeds of this check. The complainant claims that she is entitled to a third interest in this sum according to the undertaking of the parties, as in the case of the other properties that were sold in the course of the development and to which we have already made more or less specific reference. I have given this question considerable thought. The respondent denies in emphatic terms, and her counsel earnestly contends, that on no proper theory of the case should the complainant be awarded an interest in this sum of money. A photostatic copy of this check is in the record. It was made payable to the order of the two sisters by the proper fiscal agent of the Du Pont Company, was delivered to Richard Eppes, in the first instance, by the Du Pont Company, and was, by Richard Eppes, carried to the home of the sisters, and there de-

livered to them. The item in question does not appear to have been carried into the account of 'Richard Eppes, Agent,' as examined by Auditor Goodman. We must again recur to the testimony of the witness Tylar as a witness whose credibility has not been assailed or impeached, and who, I repeat, seems to have had a larger first-hand knowledge of the affairs of the parties than any other witness who has testified in the case. He was in many respects their common agent in auditing and stating the accounts of the business, and, according to the evidence, reported to the two sisters and to Richard Eppes from time to time. He stated on page 8 of his testimony that settlement of this item among the parties was held up until January, 1916, 'because Eppes and his sisters did not want this particular item to come into their transactions for 1915.' He further testified that Eppes did not directly receive a third of the proceeds of the check:

" 'He received an off-setting value in the money that was expended on the Pecan avenue house.'

"He stated that Richard did not receive a deed to the interest of his sisters in the house in lieu of his interest in the check; that his failure in this particular was due to sheer neglect on his part. * * * The Pecan avenue property was a small parcel, containing a few acres, and was the home of Richard Eppes at the time of his death in 1922. There was evidently some underlying connection between the interest of the parties in the Pecan avenue property and in the check. Tylar, as we have seen, is quite definite on the subject; the testimony of the respondent, in her own behalf, will warrant the same conclusion. She claims * * * that the check 'came before our contract, and neither one of us knew he had any share in it, and she never had any conversation with him about it and he never mentioned that subject.' At a later period of her testimony, the following colloquy occurred between the respondent and counsel for the complainant:

" 'Q. Miss Eppes, you had been giving, and continued to give Richard Eppes one-third of the proceeds of sales made by him. What was the method by which you intended him getting his one-third of this sale?

" 'A. He wanted it. We intended, my sister and myself, giving him my interest in the house. We would get after him to have the deed made out. And he told us repeatedly that there was, plenty of time to do it. And then, why the thing drifted along. But it was open to him from 1916.'

"It might be with some plausibility contended that the two written contracts were in the nature of the case retroactive; that looking to the future, they, of course, contemplated proceeds of future sales, but that, so far as sales might have been made antecedently to the contracts, the compensation of the Richard Eppes' estate would attach as well to sales that had already been made, the amounts of which were easily ascertained. But it is not necessary to adopt this view. I think, as I have said, that the original, oral agreement under which Richard Eppes began his services to his sisters was essentially the equivalent of the two contracts subsequently executed by the parties in writing so far as his remuneration with respect to property sold by him pursuant to the oral contract, was concerned. I see no occasion, therefore, to take the check out of the operation of the contract, or to deny to the estate of Richard Eppes title to an interest in the sum of money represented by this check. It remains to be considered whether or not that interest has in any wise been satisfied. The Pecan avenue property at the time of the inauguration of Richard Eppes' relations as the agent of his sisters, was owned jointly by the sisters and their brother. After the death of Miss Emily Eppes, and the subsequent death of Miss Josephine D. Eppes, the title of record in this place vested jointly in Richard and his sister, Mary. Richard was seized of an undivided one-third interest, and his sister Mary of an undivided

two-thirds interest as the successor in title of her sister, Josephine. The fate of the legal title of this property was finally determined by the suit already mentioned of *Richard Eppes' Creditors* v. *Richard Eppes' Estate,* formerly pending in the Circuit Court of Prince George County. By the decree of that court, the interest of Richard Eppes was sold, and was purchased by Mary. The sum of $5,000 realized from the sale of the interest, under the decree, of Richard Eppes was applied in satisfaction of his debts. So, as the record stands, the respondent is the sole owner of this property by an absolute title in severalty. This result would preclude the assertion of any rights against the respondent by the complainant under ordinary circumstances with respect to this parcel of land. In the absence of the intervening rights of a third party, the respondent may, nevertheless, be held to answer any equities which may be properly asserted on behalf of the estate of Richard Eppes against the land thus acquired under the decree in the creditors' suit. She might still in equity be held a trustee for Richard Eppes *quoad* any equitable interest therein to which he might be entitled. The assertion of any such rights by the complainant must be determined only with due caution. If she were fully apprised of her equitable interest in the property, as a party to the proceedings in Prince George, she would, perhaps, be concluded by the final decree of that court. But Mary Eppes did not remain a party defendant to the proceedings in Prince George. On her motion, she was dismissed, and the cause proceeded against Richard Eppes' estate and Richard Eppes' successors in title.

"But, according to the evidence, the complainant does not appear to have been apprised of her rights, even if she could have asserted them against the respondent in the Prince George suit. She testified that she had not previously to the suit seen the contract of the 29th of July, 1918. According to her, her knowledge of the contract was first obtained upon its production in the cross-

examination of Samuel W. Zimmer. She knew that there was such a contract in existence.

"'I could never find my husband's copy of it.'

"The copy that was produced was,

"'I believe, Miss Josephine's contract * * * hunted for it, but could never find it.'

"She has testified without substantial contradiction, as I have already noted, that all the papers of the Richard Eppes agency, except a few in his personal safe, of which she took possession, were removed from the office of Richard Eppes by the respondent and kept in her custody until the institution of this proceeding when it became necessary on the motion of the respondent to audit the accounts of 'Richard Eppes, Agent.'

"Since it is my opinion that the circumstances do not inhibit her from an equitable demand against the respondent, it remains to be determined in what form, if any, such demand should be allowed. It may, I think, be fairly inferred from the testimony, considered in every angle under the circumstances which I have detailed at some length, that Richard Eppes was originally entitled to a third interest in the proceeds of the check of $31,-976.00. It also appears that the parties intended this interest to be commuted by the conveyance to Richard of the respondent's interest in the Pecan avenue property. The property should, therefore, be charged with liability for one-third of the proceeds of the check, subject to deduction by whatever amount may have been expended in the enhancement, if such be the case, of the value of the freehold by any improvements which the respondent may have made on the premises during her tenure of the property, pending a final settlement between the parties.

"Another question in the case which has been a matter of argument of counsel, concerns the propriety of a charge of $10,858.34 against the general expense account of the agency.

"Mr. Potts, * * * testified:

" 'This expense, amounting to $10,858.34, was a part of the general operating expense. Although it was somewhat charged to City Point, it is only a heading. These expenses came under my supervision, and I am fairly familiar with it.'

"City Point, that is, Old City Point, it is conceded, was not within the scope of the development in which the parties were associated. The area in controversy lies outside of the limits of City Point proper. If it should transpire that improvements undertaken and carried on for the benefit of property of the sisters in City Point proper, were actually paid out of the proceeds of the development in which the parties were associated under the contract, then the charge, or so much of it as pertained to work done for the sisters in Old City Point, was, so far as Richard Eppes' interests are involved, an improper expenditure. The evidence is not clear on the point. The heading 'General Operating Expenses,' 'City Point Expenses,' is of itself not necessarily conclusive of the question. The witness Potts testified that this expenditure had to do with the maintenance of teams, machinery, and appliances, employed on the common property of the parties in the development; that it was really not an expenditure on the independent property of the sisters in City Point. He submits, in somewhat argumentative form in his cross-examination, by counsel for the complainant, that the heading itself might be misleading in this particular, but that, 'City Point Expenses,' as a heading in the audit, or in the account, should be taken as meaning no more than the designation of the locality at which these instrumentalities were kept. The entry in the account under 'City Point Expenses,' he declares, does not signify that the expenses were incurred in the improvement of the sisters' property at City Point. I am of opinion that this is properly a matter of inquiry by a commissioner in chancery under a decree to be entered in this cause.

"The fundamental contention of the respondent in answer to the plaintiff's bill, is that, whatever obligation to Richard Eppes had arisen under the contracts, particularly, of course, under the last written contract, has been definitely and finally discharged by her conveyance to the decedent's estate of fifty-one lots by her deed of December 31, 1924.

"Witness Tylar testified that he selected the lots that were included in this conveyance. The witness Potts testified that he, also, had a hand in the segregation of these lots, which were granted to the complainant. The complainant on her part maintains that the settlement was made by her in ignorance of her rights before she became aware of the provisions of the written contract of July 29, 1918. The complainant vouches the tenor of the deed, itself, and asserts that, considered in its very terms, it does not purport to operate as an extinguishment of all liability on the part of the respondent to the complainant. It becomes, therefore, proper to examine the deed in its precise language. The first recital declares that:

" 'WHEREAS, Mary Eppes, during the life of Richard Eppes, made and executed a certain agreement with him, whereby she agreed during his life to pay to him for his services as her agent, one-third of the net proceeds from the sale of all lots, situated and being in the city of Hopewell, Virginia, and shown upon the sub-division as West City Point Subdivision and West City Point Addition, both of which are shown on a plat, made by W. W. LaPrade & Brother, dated the 9th day of June, 1915, and did further agree in the event of his death to convey to his estate one-third of the lots in said subdivisions remaining unsold at the time of his death.'

"It then proceeded to recite the death of Richard Eppes, on the 27th day of March, 1922.

"The next recital declares that:

" 'WHEREAS, Mary Eppes, now desires to *carry out the said agreement,* I convey to the said executors for the benefit of

the said estate, one-third of the said lots, and that Mary Van Deusen Eppes, as Executrix and Samuel W. Zimmer, as Executor of the estate of the decedent, and Mary Van Deusen Eppes in her own right, as the widow and residuary legatee of the decedent, desire to grant and release unto the said Mary Eppes such title and interest as they have in two-thirds of the said lots.'

"It then recites that some of the lots have been sold during the lifetime of the decedent, for cash, with the balance of the purchase price secured by deeds of trust, but that, on the failure of the purchasers to perform their undertakings, the property was sold and purchased at the trustees' sale, jointly, by Mary, Josephine and Richard Eppes, and that,

" 'Therefore, title to such of said lots as were purchased at trustees' sales are now in the name of Richard Eppes to the extent of a one-third interest therein.'

"It recites further that Josephine Eppes is dead, and that Mary Eppes is her successor in interest.

"It recites further that Richard Eppes, by his will, gave to his executors power to dispose of any real estate not specifically devised in order to the payment of his debts, or of any specific legacies, in case of a deficiency of personal estate for that purpose, and that the personal estate of Richard Eppes is insufficient to pay his debts and such bequests, and that his

" 'Executors, in order to obtain title of one-third of the said lots for the benefit of his estate, in order that they may be sold and in order that the contract between Mary and Richard may be carried out, have agreed to accept from her, a deed for one-third of the lots, so that all of the title thereto may be in the estate of Richard Eppes, in consideration of the executors granting and releasing to the said Mary Eppes such title, if any, as Richard Eppes may have in the remaining two-thirds of the said lots.'

"The further recital is that Mary Van Deusen Eppes as the widow of the decedent, and also residuary legatee, be-

comes a party to the deed for the purpose of granting such title as she may have, if any, to the properties therein conveyed to Mary Eppes.

"With these recitals as premises, Mary Eppes, in consideration thereof and of the conveyance made in the deed to her on the part of Mary Van Deusen Eppes, grants unto Mary Van Deusen Eppes, Executrix, and Samuel W. Zimmer, the executor of the estate of Richard Eppes, fifty-one lots of land in the city of Hopewell, Virginia, shown on the plats of West City Point Subdivision, West City Point Addition, and also shown on a plat of West City Point, made by W. W. LaPrade & Brother, June 9, 1915, recorded in the Circuit Court of Prince George County, in the clerk's office of the Corporation Court of Hopewell. These lots are specifically designated.

*"It will be observed that no such contract found in the record can be epitomized in the terms of the first recital.* There is no contract whereby Mary Eppes agreed to pay to Richard Eppes during his life for services as her agent one-third of any lots and in the event of his death to convey to his estate one-third of the lots in any subdivision. The contract of July 29, 1918, must have been the contract to which the draftsman of the instrument vaguely refers, for this contract, alone, contains the proviso, vesting in Richard Eppes any interest in the real estate of his sisters after his death (or upon the termination of the contract, whichever should first occur). This was, indeed, the contract in effect at the time of his death. The contract of July 29, 1918, entitled Richard Eppes to receive one-third, not of the 'net proceeds,' but of all the 'gross receipts, less all working expenses,' of the sales of certain described property therein indicated. Furthermore, the contract of July 29, 1918, and also, the contract of February 21, 1916, did not restrict the emolument of Richard Eppes to the issues of the two subdivisions mentioned in the recital of the deed. The earlier contract comprehended West Hopewell as

well, and any other land which the sisters might determine to subdivide and sell, lying west of Bonnacord and Bermuda streets on the plat of West City Point, and any other land owned by them on the south side of the Norfolk & Western Railroad, west of the Du Pont property, and entitled him to a participation in the rents, arising from the land then, or thereafter leased, lying west of Bonnacord street, mentioning specifically the profits from the sale of any privileges reserved in any of the streets in the subdivisions mentioned, or in any future subdivisions. The contract of July 29, 1918, includes West City Point Subdivision, West City Point Addition, West Hopewell, the lands of the sisters west of Bonnacord and Bermuda streets to the Appomattox river, appearing on the plat of West City Point, the land owned by them on the south side of the Norfolk & Western Railroad, west of the Du Pont boundary, and accorded to him the right to participate in the rents arising from land then leased or thereafter to be leased west of Bonnacord street, and in the profits from the sale or grant of any rights or privileges in the streets in these, or any future subdivisions. The deed cautiously but plainly refers to a precedent contract limiting the interest of Richard Eppes to West City Point Subdivision and West City Point Addition. This is a manifest incongruity. The rights of Richard Eppes, as well as of his estate, after his death are not by any means thus to be circumscribed. The authority for this conclusion is apparent in the plain language of the contract of July 29, 1918. No emendation is necessary to demonstrate this patent fact. On the face of the deed, itself, then, it does not appear in its very terms that it was a full or proper discharge of the contract last in effect, or even of the contract preceding it, unless the lands left in the possession of the respondent at the time of the death of her brother were to be found alone within the limitation of West City Point or West City Point Subdivision. This was not the case, nor is such the contention of the respondent. She was seized

and possessed of a considerable estate beyond the confines of these two localities. Her contention is that the land lying beyond these two subdivisions, about which the controversy here is waged, was not within the comprehension of the contract—not within the comprehension of either of the contracts—for one reason or another. The deed, therefore, is inexact in the recital. The third of the recitals provided that,

" 'Mary Eppes now desires to carry out the said agreement and convey,' etc.

"This language seems to us language of caution, rather than the language of precision. A contract may be carried out to the extent of performance, but the extent of performance may not attain to a complete performance. Whatever is done pursuant to a contract within the terms of a contract may be said to be a 'carrying out of the contract.' This does not necessarily mean that the contract is completely performed, if the act of carrying it out does not in fact fully perform the undertaking. It may be a part performance merely, and undoubtedly, the conveyance of the fifty-one lots by the deed of December 31, 1924, was a part performance of the contract, that is, a performance with respect to the two specific subdivisions mentioned in the deed. A person who urges a fact as an estoppel must show it to be a complete estoppel, if the estoppel be relied upon for that effect.

"The extraneous circumstances, as detailed in the evidence, show, as I have intimated, that there was vastly more property to which the estate of Richard Eppes might lay claim than that embraced within the lots enumerated in this deed. I will not repeat here what I have said in that connection. Tylar testified pointedly and in sententious phrase that there was to be still another partition; that other parcels were left for 'the next go around.' The evidence further shows that the deed of December 31, 1924, was entered into by the complainant in ignorance of her husband's rights in a transaction in

which she may have presumed that her co-executor, Samuel W. Zimmer, would safeguard the interest of the estate, conversant, as he appears to have been, with the rights of the parties.

"Respondent has not seen fit to base her defense upon the principle of accord and satisfaction. Her defense is that of covenants performed, fully and completely * * *

"* * * I think that the respondent herself, in another and second instrument under seal in the so-called deed of settlement of December 31, 1924, has deliberately recognized some obligation, although what I hold to be an inadequate obligation, to the estate of the decedent.

"A decree may be prepared on the basis of this opinion * * *."

When this case was called for argument it was announced from the bench that this court could not place its stamp of approval on the reply brief filed by counsel for appellee. After a further examination of the brief, we are still of that opinion. In view of the trial court's opinion, it was unnecessary to file a brief comprising eight hundred and seventy-five pages.

We find no error in the decree appealed from, and it is, therefore, affirmed.

*Affirmed.*

EGGLESTON, J, concurring in the result.